## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LARRY ROSENZWEIG, on behalf of himself and all others similarly situated, and derivatively on behalf of Nominal Defendant AMERICAN REALTY CAPITAL HEALTHCARE TRUST, INC., | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) **SECOND VERIFIED AMENDED** |
| NICHOLAS S. SCHORSCH, et al., | ) **CLASS ACTION AND DERIVATIVE** ) **COMPLAINT** |
| Defendants, | ) ) |
| | ) **JURY TRIAL DEMANDED** |
| - and - | ) ) |
| | ) |
| AMERICAN REALTY CAPITAL HEALTHCARE TRUST, INC., | ) Civil Action No. 1:14-cv-02019-GLR ) |
| | ) ) |
| Nominal Defendant. | ) |

Plaintiff, by his attorneys, alleges the following as and for his second verified amended shareholder class action and derivative complaint, upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters derived from, *inter alia*, counsel's review and analysis of documents filed with the Securities and Exchange Commission ("SEC"), press releases issued by defendants, and publicly available news sources.

1

## NATURE OF THE ACTION

1.     This action asserts both (i) direct class action claims on behalf of shareholders of HCT (Counts I, V - VI), and (ii) derivative claims on behalf of nominal defendant American Realty Capital Healthcare Trust, Inc. ("HCT" or the "Company") (Counts II – IV).

2.     Plaintiff's claims arise from a proposed transaction (the "Transaction" or "Merger"), pursuant to an agreement and plan of merger dated as of June 1, 2014 ("Merger Agreement"), which was approved by the board of directors (the "Board" or the "Individual Defendants") of American Realty Capital Healthcare Trust, Inc. ("HCT" or the "Company") on June 1, 2014. The proposed Transaction is not in the best interests of the Company and is not the product of the valid exercise of business judgment, but rather constitutes a self-interested transaction which will result in waste of the Company's assets while it provides unique benefits to certain of the Individual Defendants.

3.     Plaintiff hereby seeks to enjoin defendants from holding the shareholder vote on the Transaction until HCT shareholders are provided with a definitive proxy statement that is not false and misleading. The date of the HCT shareholder vote has not yet been publicly announced but the Transaction is to close no later than January 31, 2015. A preliminary proxy statement filed with the SEC on December 1, 2014, contains misrepresentations and/or omissions of material information which would preclude HCT shareholders from casting an informed vote on the proposed Transaction and omits a number of material facts necessary to make statements made therein not misleading, including: the fact that certain HCT directors are diverting increased payments to themselves through the proposed Transaction in amounts unknown to HCT shareholders via distribution to a special limited partner and the method by which the amount of those units was calculated, and a fair and accurate discussion of the fairness opinion performed by Citigroup Global Markets Inc. (the "Citi Fairness Opinion").

2

4.      Pursuant to the Merger Agreement, if the proposed Transaction is consummated all of the outstanding shares of HCT would be acquired by Ventas, Inc. ("Ventas") in exchange for shares of Ventas stock in amounts based upon a fixed exchange ratio of 0.1688 Ventas shares per share of HCT stock ("Exchange Ratio"), with up to 10% of the overall consideration to HCT shareholders to be paid, upon shareholder election, in cash ("Merger Consideration").

5.      If the Transaction is allowed to proceed, according to the Pre-Effective Amendment No. 2 to the Form S-4 Registration Statement and Proxy Statement/Prospectus filed with the SEC on December 1, 2014 (the "Preliminary Proxy" or the "Proxy"), the aggregate value of the Merger Consideration to be received by HCT stockholders would be over $1.9 billion. The Company's Preliminary Proxy misrepresents that the Merger consideration includes a premium above the market value of HCT shares of approximately 14%.

6.      As of this writing, however, the price of HCT stock is trading through the $11.33 per share implied price for HCT shares, and thus the cash portion offers less than the market price of HCT stock. Further, whether a significant premium, or any premium whatsoever, would be provided to HCT shareholders is dependent upon the actual consideration to HCT shareholders which is controlled by the fixed Exchange Ratio and Ventas's stock price on a date to be determined following the shareholder vote on the proposed Transaction as well as HCT's stock price, such that changes in the market price of Ventas's and HCT's stock would change the actual consideration that would be received by HCT's shareholders. HCT shareholders are being asked to blindly vote for a Transaction in which the amount of consideration they are to receive is unclear and undisclosed. There is no "collar" preventing HCT shareholders from receiving far less consideration if Ventas's shares decline in value or a mechanism to account for a significant increase in the price of HCT shares.

#2310008v.1

7.    The estimated overall amount to be paid by Ventas in the Transaction, and the overall Transaction value, is approximately $2.9 billion, which is $1 billion more than HCT shareholders overall will receive, with considerable portions of the $1 billion difference to be paid directly or indirectly to defendants Nicholas S. Schorsch ("Schorsch") and/or William M. Kahane ("Kahane"), and/or to entities which they control or in which they have a financial stake.

8.    As alleged herein, the consideration to HCT shareholders pursuant to the Merger Agreement is grossly inadequate, and the process undertaken by the Board through which the Transaction was approved is entirely unfair to HTC shareholders. Significant conflicts of interest existed which were not properly accounted for, including that unique benefits will inure to certain Individual Defendants, specifically Schorsch and Kahane, at the expense of Plaintiff and the other owners of HCT's publicly traded common stock, and because the HCT Board is soliciting approval of the proposed Transaction through materially false and misleading Preliminary Proxy.

9.    For instance, the price of HCT shares has risen since the date of the Merger Agreement to over $11.44 per share, such that the Merger Consideration does not offer HCT shareholders an adequate premium and renders the Merger Ratio and Merger Consideration inadequate and unfair.  The Merger Consideration is also inadequate because HCT shareholders will receive reduced dividends after the Transaction is consummated with a likely reduction from $0.68 per share to $0.49 per share.

10.    The Individual Defendants approved the Merger Agreement in furtherance of the interests of Schorsch and Kahane while failing to employ such basic shareholder protections as a "collar" on the Exchange Ratio or some mechanisms to account for increased in HCT shares. Accordingly, HCT shareholders are not be protected  from significant changes in either the price

4

of Ventas shares or the price of HCT shares. HCT is not permitted under the Merger Agreement
to terminate the proposed Transaction solely because of changes in the market price of Ventas
common stock.

11.    Nonetheless, the Individual Defendants have taken no steps to renegotiate the
Transaction consideration, even despite an investor presentation dated April 2014 in which the
Individual Defendants explicitly stated that HCT was a "strong value proposition compared to
public peers" including Ventas.  Instead, the Individual Defendants are attempting to allow
Ventas to acquire HCT at a bargain price, to the detriment of HCT's public shareholders, in order
to benefit and advance the interests of defendants Schorsch and Kahane.

12.    Plaintiff's derivative claims on behalf of HCT (Counts II – IV) assert bad faith
breaches of fiduciary duties by the Board, aided and abetted by the Ventas defendants and HCT's
sponsor, operating partnership and special limited partner, based upon defendants' agreement
and approval of the unfair Transaction, and breaches of the Second Amended and Restated
Agreement of Limited Partnership (the "Operating Partnership Agreement").  The Transaction is
not in the best interests of HCT and is not the product of valid exercise of business judgment, but
rather constitutes a self-interested Transaction which would result in waste of HCT's assets, and
which provide unique benefits to defendants Schorsch and Kahane.  Further, the Transaction
constitutes a breach of the Operating Partnership Agreement, to the unique benefit of Schorsch
and Kahane.

13.    Plaintiff's class action claims (Counts I, V - VI) assert, on behalf of Plaintiff and
the class of other HCT shareholders who held shares on October 28, 2014, and/or have been or
will be damaged by the proposed Transaction, violations of Section 14(a) of the Securities
Exchange Act of 1934 (the "Exchange Act") against the Individual Defendants, HCT and Ventas

for their dissemination of materially false and misleading statements in the Preliminary Proxy, breach of fiduciary duties owed by HCT's Advisor to HCT's shareholders under the Second Amended and Restated Advisory Agreement (the "Advisory Agreement"), and aiding and abetting the Advisor's breach of fiduciary duties against the Sponsor, the Operating Partnership, the Special Limited Partnership (as defined herein), Schorsch, and Kahane.

14.     For purposes of Plaintiff's Section 14(a) claim, Plaintiff's claim is asserted on behalf of himself and all other record holders of HCT common stock on the record date of the Merger (the "Proxy Class"). Excluded from the Proxy Class are Defendants, their immediate family members, affiliates, heirs, assigns, and/or agents; any officers of HCT and/or Ventas; and the parent companies and/or subsidiaries of HCT and/or Ventas.

15.     The Individual Defendants, which comprise HCT's Board, consist of Schorsch, Kahane, Leslie D. Michelson ("Michelson"), Robert H. Burns ("Burns") and P. Sue Perrotty ("Perrotty"). None of the Individual Defendants are independent from the interests of Schorsch and Kahane and the entities which they control. Schorsch and Kahane are each among the members of HCT's Board. Schorsch is Executive Chairman of the HCT Board. Schorsch and Kahane own or control, in whole or in part, entities that own or control HCT, including: American Realty Capital V, LLC ("Sponsor"), American Realty Capital Healthcare Trust Operating Partnership, LP (the "OP" or "Operating Partnership"), and American Realty Capital Healthcare Special Limited Partnership, LLC (the "SLP" or "Special Limited Partner"), which has a special limited partnership interest in the Operating Partnership and is owned in its entirety by the Sponsor, which, in turn, is majority-owned by Schorsch and Kahane. The Advisor, Property Manager and RCS are under common control with the Sponsor, and, as a result, thereof, they are related parties.

6

#2310008v.1

16.     As an umbrella real estate investment trust, or "UPREIT," HCT holds its properties in a limited partnership, the "Operating Partnership" or "OP" herein, the General Partner of which is the Company. The Company, in turn, holds a majority of the OP Units. One of the Operating Partnerships' limited partners is the SLP, an entity which is majority owned by Schorsch and Kahane, through the Sponsor, which in turn also wholly owns the Advisor, which shares common ownership with RSC. The SLP is the entity through which the Sponsor, and thus Schorsch and Kahane, receive their profit distributions from the Company.

17.     These affiliated relationships can be diagrammed as follows:



18.     Schorsch and Kahane have direct pecuniary interests in the Transaction that are not shared by the Company or by HCT's public shareholders. The Operating Partnership will survive the Transaction, and a distribution will be provided to the Special Limited Partner of over 5.6 million units of the Operating Partnership (which are convertible into Class C units of the Operating Partnership), giving the SLP majority control over the Operating Partnership

7

(which has approximately 1.5 million units presently), enabling it to maintain an even larger percentage of the Operating Partnership's distributions. It will further dilute the Company's interest which presently is the majority holder of Operating Partnership Units.

19.     Under a listing note agreement dated April 7, 2014 (the "Listing Note Agreement"), and an amendment thereto executed on June 1, 2014 in connection with the Transaction, the amount of the SLP's distribution pursuant to the Listing Note Agreement is based upon a formula which is keyed to the market value of the Company's stock, defined as the average trading price for a 30-day period commencing 180 to 260 days after the Company first lists on a national exchange.

20.     Given that the Company first listed on NASDAQ on April 7, 2014, the market value, and thus the amount of the SLP's distribution pursuant to the amended Listing Note Agreement, could not be - and still cannot be – determined.  However, even using the 30-day average unaffected price of HCT stock before the announcement of the Transaction, Schorsch and Kahane are receiving a windfall of over $38 million in stock.

21.     Nonetheless, as part of the Transaction, the Individual Defendants, including Schorsch and Kahane, have already agreed that the SLP, and thus Schorsch and Kahane, will receive over 5.6 million units of the Operating Partnership, and that the value of these units will be "booked up" for tax purposes.

22.     This is particularly significant as HCT shares traded below the $10 per share offering price a significant amount of the time since its listing on April 7, 2014 and until the announcement of the Transaction.  Under the formula contained in the Listing Note Agreement and the amendment thereto, as further discussed below, the SLP's distribution was likely to be minimal or non-existent, since the Company's stock was trading below its offering price.

#2310008v.1

Consequently, by announcing the Transaction, and then setting the amount of shares to be distributed to the SLP in the Transaction pursuant to the amended Listing Note Agreement, Schorsch and Kahane were able to ensure that the SLP received an excessive distribution and secure their control over the Operating Partnership and lucrative distributions of profit produced by the Company's properties.  In the meantime, the Company and its shareholders would receive less consideration than they are entitled to and would own just a small percentage, approximately 8 percent, of the resultant company, and HCT would cease to survive.

23.    As further discussed below, this information and the underlying distributions to the Special Limited Partner which are necessary to understanding the conflicts attendant to this Transaction, are not disclosed in the Preliminary Proxy.

24.    According to an investor presentation (the "Investor Presentation") filed by the Company on June 2, 2014, the Company's stockholders would have received $11.77 per share, absent the SLP distribution, and thus the Company would have received greater consideration, but for the distribution to be made to the SLP.

25.    The Company constitutes the general partner (the "General Partner") of the Operating Partnership.   As such, the members of the Company's Board, the Individual Defendants, are all in a conflict of interest situation since they owe conflicting fiduciary obligations to both limited partners and SLP of the Operating Partnership, and to the Company. By approving the Transaction, which benefits the SLP and Schorsch and Kahane, the Individual Defendants breached their fiduciary duties to the Company by failing to put the interests of the Company ahead of those of the limited partners and the SLP.  As the Board of the General Partner, they also breached Section 6.04 of the Operating Partnership Agreement, under which

the General Partner is required to resolve any conflicts between HCT's stockholders and the limited partners of the Operating Partnership in favor of the stockholders.

26.     Although the Transaction is a self-interested one, in which Schorsch and Kahane stand to benefit directly through their ownership of the Sponsor and the SLP, the Transaction was negotiated without the institution of a special committee to protect the Company from Schorsch and Kahane's self-interest and was approved by the entire Board notwithstanding its conflicts, and without independent counsel engaged solely on behalf of the Company and its shareholders.  Moreover, at least one of the Company's financial advisors on the Transaction was an affiliate of RCS Capital Corp. ("RCS"), an entity which is controlled by Schorsch, and which Schorsch and Kahane used to sell shares of the Company to the public.

27.     The resulting Transaction is thus the product of an unfair process, and is being attempted at an unfair, and uncertain, price.  It is not the product of business judgment. As such, Plaintiff seeks to enjoin the Transaction unless and until its terms are renegotiated through a fair process, and an accurate Proxy is disseminated; alternatively, Plaintiff seeks damages.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action under federal question jurisdiction pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States.  This Court has exclusive jurisdiction, pursuant to Section 27 of the Securities Exchange At, 15 U.S.C. §78aa, because this action asserts claims under Section 14(a) of the Exchange Act, 15 U.S.C. §§78n(a), and has supplemental jurisdiction under 28 U.S.C. §1367(a) over the non-federal claims asserted herein.

29.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, diversity jurisdiction, as Plaintiff is a resident of Connecticut, and each of the Defendants is a resident of a

state other than Connecticut, as further discussed below.   Further, the amount in controversy exceeds $75,000.

30.     This Court also has jurisdiction pursuant to Article XIV of the Company's Amended and Restated Bylaws (the "Bylaws") entitled "Exclusive Forum for Certain Litigation," filed with the SEC on April 7, 2014, as Exhibit 3.1 to Form-K, which provides, "Unless the Corporation consents in writing to the selection of an alternative forum, the Circuit Court for Baltimore City, Maryland, or, if that Court does not have jurisdiction, the United States District Court for the District of Maryland, Baltimore Division, shall be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of any duty owed by any director or officer or other employee of the Corporation to the Corporation or to the stockholders of the Corporation, (c) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation arising pursuant to any provision of the MGCL, the Charter or these Bylaws, or (d) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation that is governed by the internal affairs doctrine."

31.     Venue is proper in this District under 28 U.S.C. §1391 as this is the District where certain of the Defendants reside and where the cause of action arose and where substantial acts in furtherance of the alleged wrongdoing and/or their effects have occurred, and HCT is a Maryland corporation.

32.     This action is not a collusive action to confer jurisdiction on this Court.

**THE PARTIES**

33.     Plaintiff is now, and at all times relevant to this action has been, a holder of HCT common stock.  Plaintiff is a resident of the State of Connecticut.

#2310008v.1

34.     Nominal Defendant HCT is an UPREIT, which was formed in August 2010, and is organized and exists under the laws of the State of Maryland.  The Company's principal executive office is located at 405 Park Avenue, 15th Floor, New York, New York 10022.

35.     HCT is one of nine REITS sponsored by the American Realty Capital group of companies, all of which are located at American Realty Capital's executive headquarters in New York.

36.     After a two year public offering, HCT stock commenced publicly trading as of April 7, 2014, on the NASDAQ.  As of April 21, 2014, 182,938,268 shares of HCT common stock were issued and outstanding.

37.     As of March 31, 2014, the Company owned 129 properties, and one preferred equity investment, located in 27 states, with an aggregate purchase price of $1.9 billion, comprised of 6.8 million rentable square feet.

38.     HCT has no employees.  Its management functions are performed by the Advisor, defined below, which has been delegated those duties by the Board.

39.     The Company's property manager is American Realty Capital Healthcare Properties, LLC (the "Property Manager"), and the Company's dealer manager is Realty Capital Securities, LLC (the "Dealer Manager").  The Property Manager is a wholly owned entity of, and the Dealer Manager is under common ownership with, the Company's Sponsor, which is majority owned and controlled by Schorsch and Kahane.

40.     The Company's executive officers, of which there are currently five, are all employees of the Advisor and do not receive any compensation directly from the Company, nor does the Company reimburse the Advisor for the salary or other compensation it pays to the Executive Officers. The Company does not have a conflicts committee.

41.    Defendant American Realty Capital V, LLC ("Sponsor") is a Delaware limited liability company and HCT's Sponsor. It is indirectly or directly controlled by Schorsch and Kahane, as well as American Realty executives Peter M. Budko ("Budko"), Brian S. Block ("Block"), and Edward M. Weil, Jr. ("Weil"). It wholly owns the Special Limited Partner and the Advisor and is under common ownership with RCS, a broker dealer which was used to sell the Company's shares, and which, through an affiliate, acted as a financial advisor to HTC on the Transaction despite its conflicts. RCS is wholly owned by American Realty Capital II, LLC ("ARC II"), which is directly or indirectly owned by Schorsch, Kahane, Budko, Block and Weil, and controlled by Schorsch and Kahane. The Sponsor is sued as an aider and abettor.

42.    Defendant Advisor is a Delaware limited liability company and the external advisor for managing the day to day activity of HCT. Advisor is an affiliate of the American Realty Capital group of companies, and is wholly owned by the Sponsor. Pursuant to the amended Advisory Agreement, to which the Advisor, the Company and the Operating Partnership are parties, the Advisor serves as the Company's and the Operating Partnership's investment and financial advisor and is a fiduciary to both the Company's shareholders and the partners in the Operating Partnership. It has also been delegated the responsibility of overseeing all "Affiliates of the Advisor and Persons acting in any other capacity deemed by the Advisor necessary" to enable it to perform those obligations delegated to it by the Board. The Advisor, a limited partner, also holds 202 OP Units.

43.    The Advisor is sued derivatively herein for breaching its fiduciary duties to nominal defendant HCT and directly by the putative class members for breaches of the fiduciary duties which it owes to them directly.

13

44.     Defendant the Operating Partnership is a Delaware limited partnership, and the operating partnership through which the Company operates and holds it properties.   The Company is the sole General Partner of OP and holds a majority of all of the units of limited partner interests in the OP ("OP Units").   According to the Partnership Agreement, Section 6.04(b), the General Partner acts for the benefit of the Partnership, the Limited Partners, and the General Partner's stockholders.   Where there is a conflict between the interests of the Limited Partners and the stockholders that cannot be resolved in a manner not adverse to either the stockholders, the Limited Partners or the Special Limited Partner, it "shall be resolved in favor of the stockholders of the General Partner".   Given that the General Partner is the Company, the Board of the General Partner is the Board as defined herein.

45.     The Operating Partnership is sued as an aider and abettor.

46.     Defendant SLP is a Delaware limited liability company, and a limited partner of the Operating Partnership.   It is wholly owned by the Sponsor, and thus indirectly, by Schorsch and Kahane.   It is the primary entity through which the Sponsor earns and takes a profit from the Company's (and the Operating Partnership's) operations, as it was, before the announcement of the Transaction, entitled to distributions based upon a formula set forth in the Partnership Agreement. As a consequence of the Transaction, the SLP will be contributing its Special Limited Partner Interest, or the distribution to which it would have been entitled, for over 5.6 million units of the Operating Partnership, which OP Units are convertible to Class C Units of the Operating Partnership.   Class C Units represent the SLP's profit interests in the Operating Partnership.

47.     The SLP is being sued as an aider and abettor so that complete relief can be awarded.

14

48.     Defendant Schorsch is now, and at all times relevant to this action has been, Chairman and/or Executive Chairman of the Company's Board of Directors.   Schorsch and Kahane are the co-founders of the American Realty Capital family of entities — entities which are known to complete liquidity events within a short period after raising public money. Schorsch served as Chairman of the Board since the Company's formation in August 2010, and as the Company's chief executive officer ("CEO") from August 2010 until March 2014, when he became the Executive Chairman of the Board.   Schorsch was most recently re-elected to the Board for a one-year term at the Company's May 28, 2014 Annual Meeting of Stockholders (the "2014 Annual Meeting").   He is a resident of New York.

49.     Schorsch has further acted as a director, chairman of the Board, and/or chief executive officer of every other related American Realty Capital entity, including but not limited to American Realty Capital Trust, Inc., Philips Edison—ARC Shopping Center REIT Inc., American Realty Capital—Retail Centers of American, Inc., ARC RCA, ARC RCA advisor, New York REIT, Inc., NYRT Advisor, NYRT Property Manager, American Realty Capital Daily Net Asset Value Trust, Inc., ARC DNAV Advisor, ARC DNAV Property Manager, American Realty Capital Properties, Inc., American Realty Capital Global Trust, Inc., ARC Global Advisor, ARC Global Property Manager, American Realty Capital Trust IV, Inc., ARCT IV Advisor, ARCT Property Manager, American Realty Capital Healthcare Trust II, Inc., ARC HT II, Advisor and ARC HT II Property Manager, among other entities.

50.     Schorsch, together with Kahane, is a majority owner of, and controls, the Sponsor, which wholly owns the Advisor.   Schorsch also serves as Executive Chairman of the board of directors of RCS Capital, an affiliate of which acted as a financial advisor to HCT in

15

connection with the Transaction, and whose broker dealer is Realty Capital Securities, LLC ("RC Securities"). Schorsch, is also one of the majority owners of the Sponsor, ARCP V.

51.     Defendant Kahane is now, and at all times relevant to this action has been, a director of the Company, and was the President and Chief Operating Officer of the Company, the Advisor, and the Property Manager.   Kahane, who co-founded the American Realty Capital group of entities, has also served as an executive officer and/or director of many of the related American Realty Property entities, including ARCT, ARC RCA, ARC RCA Advisor, ARC RCA Property Manager, ARC DNAV, ARC DNAV Advisor, ARC DNAV Property Manager, ARCT III, ARCT III Advisor, ARCT III Property Manager, NYRT, ARCP, ARCP Advisor, BDCA, RCS Capital, ARC HT II, and RCS Capital. He is a resident of New York.

52.     Kahane, together with Schorsch, is a majority owner of, and controls, the Sponsor, which wholly owns the Advisor.   Kahane also serves as Chief Executive Officer of RCS Capital, an affiliate which acted as a financial advisor to HCT in connection with the Transaction, and whose broker dealer is RC Securities.

53.     Defendant Michelson is now, and at all times relevant to this action has been, a director of the Company.   Michelson was initially appointed to the Board in January 2011 and was most recently re-elected to the Board for a one-year term at the Company's 2014 Annual Meeting.   Michelson is Chairperson of the Audit Committee of the Board, the Compensation Committee and the Nominating and Corporate Governance Committee.   On July 10, 2012, the Board appointed Michelson as the lead independent director of the Company.   He is a resident of California.

54.     Michelson has also served as a director on many of other American Realty Capital entities, including RCS Capital, BDCA, ARC RCA, and NYRT.   Michelson has served on over

16

three related entities at the same time, including ARC RFT, RCS Capital, ARCG and BDCA. Prior to listing, the Company was governed by the Statement of Policy Regarding Real Estate Investment Trusts issued by the North American Securities Administrators Association, or the NASAA Guidelines. Under Definition 14 of the NASAA Guidelines, Michelson did not qualify as an independent director prior to the Company's listing given his directorships on more than three related entities at the same time, and cannot now be considered an independent director. Further, as a board member of the General Partner of the Operating Partnership, which provided the SLP with an excessive distribution at the expense of the Company and its shareholders, Michelson was conflicted and placed the interests of the SLP, and thus ARCP V, Schorsch and Kahane above those of the Company and its shareholders.

55.     Defendant Burns is now, and at all times relevant to this action has been, a director of the Company.     Burns is a member of the Board's Audit Committee, the Compensation Committee and the Nominating and Corporate Governance Committee. He is a resident of New York.  Burns has a longstanding relationship with Kahane, undercutting his independence.

56.     Burns has also served as a director on many other American Realty Property entities including NYRT, ARCT III, ARCT and American Realty Capital Properties V, Inc.  As a board member of the General Partner of the Operating Partnership, which provided the SLP with an excessive distribution at the expense of the Company and its shareholders, Burns was conflicted and placed the interests of the SLP, and thus ARCP V, Schorsch and Kahane above those of the Company and its shareholders.

57.     Defendant Perrotty is now, and at all times relevant to this Action has been, a director of the Company.  Defendant Perrotty was initially appointed to the Board in November

17

2013, and was most recently re-elected to the Board for a one-year term at the Company's 2014 Annual Meeting.   Defendant Perrotty is a member of the Board's Audit Committee, the Compensation Committee and the Nominating and Corporate Governance Committee.   Perrotty has also served as a director of ARC DNAV.  She is a resident of Pennsylvania.

58.     Defendant Ventas, a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 533 North Clark Street, Suite 3300, Chicago, IL 60654.  It is a REIT and an S&P 500 company, with a portfolio of nearly 1,500 assets in 47 states, two Canadian provinces, and abroad, and provides management, leasing, marketing, facility development and advisory services to hospitals and health systems throughout the United States.

59.     Defendant Stripe Sub, LLC (the "Merger Sub") is a Delaware limited liability company, with an agent for service of process in Delaware, and a direct wholly-owned subsidiary of Ventas.  It is being sued so that complete relief can be granted.

60.     Defendant Stripe Op, LP (the "OP Merger Sub") is a Delaware limited partnership, with an agent for service of process in Delaware and   is being sued so that complete relief can be granted.

## THE INDIVIDUAL DEFENDANTS' DUTIES

61.     Under Maryland Corporations and Associations Law, Section 2-405(a), the Individual Defendants owe fiduciary duties to the Company of (1) good faith; (2) to act in a manner reasonably believed to be in the Company's best interest; and (3) with ordinary care.

62.     Moreover, in the event of a self-interested transaction, in which directors stand on both sides of the transaction, as in this instance, the Individual Defendants are required to act in a manner that is entirely fair to the Company; that is, the process through which the transaction is

18

obtained must be entirely free of the taint and interest of the self-interested directors, and the price at which the transaction is obtained must be fair and adequate. The Individual Defendant must also be fully informed.

63.     In accordance with their fiduciary duties as directors and/or executive officers of HCT, the Individual Defendants were obligated to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties were divided;

(b)     participating in any transaction where the directors or officers were entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

64.     The Individual Defendants are acting in concert with one another in violating their fiduciary duties as alleged herein, and specifically in connection with the Transaction.

## THE INDIVIDUAL DEFENDANTS LACK INDEPENDENCE

65.     Plaintiff brings this action derivatively, in part, in the right and for the benefit of HCT, for the injuries which it has and will continue to sustain as a result of the Transaction and Individual Defendants' breaches of their fiduciary duties to HCT and them for their breaches of the Advisory Agreement.

66.     Plaintiff owns and has owned HCT common stock at all times relevant hereto. Plaintiff will adequately and fairly represent the interests of the Company. Plaintiff has retained counsel experienced in these types of actions to prosecute claims on the Company's behalf.

#2310008v.1

67.     Any pre-suit demand upon the Board to commence this Action would have been futile and is excused based upon the allegations above.

68.     The Board is composed of the five Individual Defendants, Schorsch, Kahane, Burns, Michelson and Perrotty.  As further described above, both Schorsch and Kahane have direct pecuniary interests in the Transaction and as such stand on both sides of the Transaction. Given their interests, and the fact that they are both inside directors, they are not independent for purposes of demand futility and could not independently respond to a shareholder demand for action.

69.     Burns is not independent for purposes of demand futility. Burns has served as a director on multiple related American Realty entities including HCT, NYRT, ARCT III, and ARCT and has a longstanding relationship with Kahane such that he cannot and does not act independently of Kahane.

70.     Further, Burns has acted in a conflict of interest situation in that he has acted as a board member of the General Partner, while acting as a Board member of HCT, at a time when the interests of the SLP and the Operating Partnership (and Schorsch and Kahane) were placed ahead of those of HCT and its shareholders.

71.     For similar reasons, Michelson cannot be considered independent for purposes of considering whether a pre-suit demand would have been futile.  Michelson has simultaneously served on at least four boards of related American Realty Capital entities, HCT, RCS Capital, ARCP and BDCA, which is a violation of the independence standard under the NASAA Guidelines, which were applicable to the Company several months ago.

72.     Michelson further acted on the boards of both the General Partner of the Operating Partnership and the Company at the same time, placing him in a conflict of interest

situation in which he placed the interests of the Operating Partnership, the SLP, and thus Schorsch and Kahane, ahead of those of the Company.

73.     Perrotty cannot be considered independent since she served on both the board of the General Partner and the Company at the same time, and in that context put the interests of the Operating Partnership, the SLP, Schorsch and Kahane over those of the Company.

74.     Finally, Ventas has agreed to indemnify the Individual Defendants and hold them harmless from liability with respect to the Transaction.  These Individual Defendants may also remain as board members of the General Partner, which will remain as the General Partner of the Operating Partnership after the consummation of the Transaction.

75.     None of the Individual Defendants is independent, either because he/she has direct  pecuniary interests in the Transaction and in the American Realty Capital family of entities, has repeatedly acted as a director at the behest of Schorsch and Kahane in various American Realty Capital related entities, acted both as the director of HCT and effectively as a director of the General Partner of the Operating Partnership, thus acting in  a conflict of interest situation, and/or there is a substantial basis for his/her liability for having approved the Transaction and having placed the interests of the SLP, Kahane and Schorsch ahead of those of the Company.

76.     Thus a pre-suit demand upon the Board would have been futile.  This is especially true since, as the Company has represented in a recent Schedule 14(a) Proxy Statement filed with the SEC on April 28, 2014, at page 10, it does not have a process for approving affiliated or conflicted transactions ("The Company does not currently have a conflicts committee.").

77.     As the April 28 Proxy Statement states, at page 10, "The entire Board is actively involved in overseeing risk management for the Company through its approval of all property

21

Transactions, incurrence and assumptions of debt, its oversight of the Company's executive officers and the Advisor, managing risks associated with the independence of the members of the Board, and reviewing and approving all transactions with affiliated parties and resolving other conflicts of interest between the Company and its subsidiaries, on the one hand, and the Sponsor, any director, the Advisor or their respective affiliates, on the other hand."

## CLASS ACTION ALLEGATIONS

78.     For purposes of Plaintiff's Section 14(a) claim, Plaintiff's claim is asserted on behalf of himself and all other record holders of HCT common stock on October 28, 2014 (the "Proxy Class").   Excluded from the Proxy Class are Defendants, their immediate family members, affiliates, heirs, assigns, and/or agents; any officers of HCT and/or Ventas; and the parent companies and/or subsidiaries of HCT and/or Ventas.

79.     Plaintiff also brings direct claims against the Advisor for breach of its fiduciary duties owed to HCT's shareholders, and against the Sponsor, Schorsch, and Kahane, as aiders and abettors, for the breach of the Advisor's direct fiduciary duties to those HCT's shareholders who will be damaged by the Transaction (the Advisor, the Sponsor, Schorsch, and Kahane are, collectively, the "Class Action Defendants").   Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant (the "Breach of Fiduciary Duty Class").

80.     The members of the Classes are so numerous that joinder of all of them would be impracticable.   As of April 21, 2014, 182,938,268 shares of HCT common stock were issued and outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

81.     Plaintiff's claims are typical of the claims of the Classes because Plaintiff has the same interests as the other members of the Classes and Plaintiff and the other members of the Classes have and will sustain harm arising out of the Class Action Defendants' actions. Plaintiff does not have any interests that are adverse or antagonistic to those of the Classes. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff is committed to the vigorous prosecution of this Action and has retained counsel competent and experienced in this type of litigation.

82.     Questions of law and fact common to the members of the Classes predominate over any questions which, if they exist, may affect individual Class members. The predominant questions of law and fact include, among others, whether:

(a)     the Class Action Defendants have and are breaching their fiduciary duties owed to Plaintiff and the Class and/or whether they have violated Section 14(a);

(b)     the Transaction is entirely fair or an exercise of reasonable business judgment;

(c)     whether the Proxy is materially false and misleading; and

(d)     whether Plaintiff and the Classes are entitled to an injunction and other equitable relief and/or damages.

83.     A class action is superior to all other available methods for the fair and efficient adjudication of the claims against the Class Action Defendants, since joinder of all members is impracticable. The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for the Class Action Defendants,

23

or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.   Plaintiff anticipates no difficulty in the management of this action as a class action.

84.   The Class Action Defendants have acted, or refused to act, on grounds generally applicable to, and are causing injury to the Class, and, therefore, final injunctive relief on behalf of the Class as a whole is appropriate.

## FACTUAL ALLEGATIONS

### *Creation and Listing of HTC*

85.   HCT is an UPREIT which is part of the American Realty Capital family of entities, co-founded and controlled in large part by Schorsch and Kahane.  It was created in August 2010 as a publicly held non-listed REIT. From the period of February 2011 to April 2013, the Company held an IPO selling approximately 180 million shares at approximately $10 per share for gross proceeds of $1.8 billion, including proceeds from a dividend reinvestment plan or DRIP, in which shares were sold at $9.50 per share. The shares were offered on a reasonable best efforts basis by the Schorsch and Kahane affiliate, RCS, among others.

86.   The Company presently has a portfolio composed of medical office buildings, senior housing communities, hospitals and post-acute care facilities.  As of June 2014, it holds 143 properties throughout 27 states with an aggregate purchase price of $1.6 billion.

87.   The Company closed its IPO in April 2013 and operated as a non-traded REIT through April 6, 2014, when the Company's common shares were listed for trading on the NASDAQ (the "Listing").

88.   On April 7, 2014, the Company filed a Form 8-K with the SEC announcing the April 7 commencement of trading of the Company's common stock on the NASDAQ under the

24

ticker symbol "HCT."   Commenting on the Company's NASDAQ listing, HCT's CEO Tom D'Arcy stated, "ARC Healthcare's successful listing on NASDAQ is a very important milestone for the company.  By listing on NASDAQ, we achieve two goals: position the company for more efficient access to the capital markets to drive future growth and provide liquidity for our shareholders."

89.     The CEO further stated, "We believe our strong and diverse portfolio of 141 real estate assets, with 7.1 million rentable square feet, combined with our proven ability to acquire strategic assets, our experienced management team and our investment grade quality balance sheet, positions us well for future growth and continuing success."

90.     Also commenting on the listing, Schorsch stated, "Our focus has always been to enhance shareholder value by building a well-diversified portfolio of assets, with a strong and flexible capital structure, led by an experienced and proven management team.  By strategically and systematically executing our business plan, which includes today's listing of our shares on NASDAQ, we believe ARC Healthcare is well-positioned to further drive value throughout the next phase of the company's evolution."

91.     The Company also announced on April 7, 2014, that it was commencing a concurrent tender offer to purchase an amount in value of its shares of common stock up to $150 million from its stockholders, for $11 per share, net to the seller in cash, less any applicable withholding taxes and without interest (the "Tender Offer").

92.     Despite the Tender Offer, which was timed to increase the trading price of HCT shares, from its Listing until the announcement of the Transaction HCT's stock frequently traded below its $10 per share offering price.  Since the filing of the Preliminary Proxy Statement, the

price of HCT shares have been rising, and its priced presently exceeds the implied Merger Consideration of $11.33 per share.

93.     The declining stock price, plus the decrease in fees and distributions accruing to the SLP, the Advisor, the Property Manager and other Schorsch and Kahane affiliates, induced the Defendants to enter into the Transaction, as further discussed below.

### HCT Generates Fees for the Benefit of Schorsch and Kahane

94.     HCT was designed as a mechanism to generate fees for Schorsch and Kahane through their American Realty Capital affiliates and to raise money and liquidate quickly in order to generate fees and distributions for the SLP, and thus the Sponsor, Schorsch and Kahane.

95.     As an UPREIT, HCT holds its properties in a limited partnership, the Operating Partnership, the General Partner of which is the Company, which also holds a majority of the OP Units. One of its limited partners is the SLP, an entity which is majority owned by Schorsch and Kahane, through the Sponsor, which in turn also wholly owns the Advisor, which shares common ownership with RSC.  The SLP is the entity through which the Sponsor, and thus Schorsch and Kahane receive their profit distributions from the Company.

96.     As noted above, these affiliated relationships can be diagrammed as follows:

26



97.     The primary means for the Sponsor, Schorsch and Kahane and their affiliates to earn monies from the Company was through the sale and purchase of shares by RCS, the sale and purchase of properties through which the Advisor would earn fees, and the management of these properties through which the Property Manager would earn fees.

98.     Upon liquidation, the Sponsor, Schorsch and Kahane would earn a profit payment through the SLP Interest in the Operating Partnership.

99.     Thus, prior to listing and its purchase of its portfolio, the Company was subject to a host of fees payable to the various American Realty entities, including the following:  selling commissions payable to the Dealer Manager (RSC) for the sale of common stock; a Dealer Management Fee to the Dealer Manager (RSC); the Offering Expenses to the Advisor; Property Transaction Fees to the Advisor; Transaction Expenses to the Advisor; Asset Management Fees to the Advisor; Property Management Fees to the Advisor; Operating Expenses to the Advisor;

27

Financing Coordination Fees to the Advisor; and Real Estate Commissions to the Advisor or any other affiliate.

100.   The SLP, on the other hand, was entitled to a fee based upon a complex formula upon the listing of the Company on an exchange which could be summarized as approximately 15% of the amount by which the market value of the Company exceeds the amount raised in the IPO plus a 6% cumulative, pre-tax, non-compounded return.

101.   As the money generated through the IPO was used to purchase properties and the IPO closed, the opportunity for Schorsch and Kahane and their various affiliated entities, including the Advisor and RCS to earn fees declined.

102.   By early 2014, the Individual Defendants, including Schorsch and Kahane, determined to commence liquidating the Company by listing it in connection the Tender Offer at $11.00 per share, in an attempt to ensure that the SLP would earn a handsome profit distribution under the Special Limited Partner Interest.

103.   The market, however, did not cooperate, and despite the fact that the Individual Defendants timed the listing with the Tender Offer, HCT's stock price continued to decline from its opening price of over $10 per share to below that price until June 2, 2014, upon the announcement of the Transaction.

104.   Given the likelihood that they would end up with no SLP distribution if the market value of the Company continued to fall, on June 1, 2014, the Individual Defendants hurriedly entered into and approved the unfair Transaction by Ventas for the benefit of the SLP, the Sponsor, Schorsch and Kahane.

***Background and Negotiation of the Merger***

105.   According to the Preliminary Proxy, even before its listing on NASDAQ, Ventas and HCT commenced negotiations concerning a potential transaction. On February 24, 2014,

28

D'Arcy, then CEO of the Advisor, met at Ventas's offices in Chicago with Ventas's Chief Executive Officer Debra Cafaro ("Cafaro") and Ventas's Senior Investment Officer, Manisha Bathija ("Bathija") to discuss the compatibility of HCT's and Ventas's portfolios. Following the meeting, HCT and Ventas shared additional publicly available information regarding one another.

106.    By March 15, 2014, although it had not yet gone public and had only completed its IPO a year before, HCT announced that it had retained Merrill Lynch, Fenner & Smith, Inc. ("Merrill") to evaluate potential financing and strategic alternatives and in December 2013, announced that a public listing was consistent with the Company's long terms strategies.

107.    According to the Proxy, nonetheless beginning shortly after HCT's March 31, 2014 announcement of its intention to list on NASDAQ, Schorsch and Cafaro had several preliminary conversations regarding HCT's business and its existing portfolio as well as a potential acquisition of HCT by Ventas. HCT's management advised members of the HCT Board of the conversations and Ventas's potential interest in a transaction.

108.    Under the Listing Note Agreement, upon lisiting, Schorsch and Kahane would be receiving a distribution roughly equal to the 15% of the market value of the Company over its initial offering price less a 6% preferred return to shareholders and debt.

109.    However, upon its public offering, the price of HCT shares traded at or below its public offering price, thereby yielding Schorsch and Kahane little, if any, distributions.

110.    Consequently, on April 8, 2014, Schorsch met with Cafaro and Bathija at Schorsch's office in New York City they  explored a strategic business combination. Schorsch stated that he believed that HCT would be willing to provide due diligence information regarding

its business to Ventas, subject to the negotiation and execution of a mutually acceptable non-disclosure agreement ("NDA"), which HCT and Ventas did enter into on April 9, 2014.

111.    On or about April 18, 2014, Cafaro and Schorsch had a telephonic conversation during which Cafaro made a preliminary offer of in the range of $10.75 to $11.00 per share gross (inclusive of SLP distributions), at a time when HCT's stock was trading at approximately $10.40 per share.  During a subsequent conversation on April 21, 2014, Cafaro related a revised preliminary indication of interest in the range of $11.00 to $11.25 per share.  On May 2, 2014, HCT's stock reached a high of $10.92 per share.

112.    During March, April and May 2014, the HCT Board, together with HCT's management and advisors, evaluated and negotiated the terms of a possible business combination transaction in which HCT would have acquired a third party unrelated to Ventas (the "Unrelated Possible Acquisition").  The third party was a large healthcare REIT (Griffin Healthcare) (the "Unrelated Party"), with assets that were complementary to those of HCT, and completion of such transaction would have resulted in HCT significantly expanding its portfolio of properties.  To complete the transaction HCT would have had to, among other things, enter into asset-based financing arrangements.

113.    In an effort to push up the price of HCT stock, HCT engaged in a tender offer, on May 2, 2014, the HCT Tender Offer expired and a total of 70,239,505 shares of HCT's common stock were properly tendered and not properly withdrawn at the purchase price of $11.00 per share.  In accordance with the terms and conditions of the HCT Tender Offer, HCT accepted for purchase 13,636,364 shares of HCT's common stock at a purchase price of $11.00 per share, for an aggregate cost of approximately $150,000,000, excluding fees and expenses relating to the tender offer.

114.   On May 23, 2014, Cafaro and John Cobb ("Cobb"), Ventas's Executive Vice President and Chief Investment Officer, called Schorsch and conveyed Ventas's interest in acquiring all outstanding shares of common stock of HCT.   The Ventas indication of interest contemplated merger consideration of $11.75 per share "gross", assuming 169.3 million outstanding HCT shares on a fully-diluted basis.   The amount to be received by HCT stockholders would be adjusted for any amounts payable with respect to certain affiliate agreements, with the consideration to consist of Ventas stock as of May 22, 2014 close.   Cafaro and Cobb indicated that Ventas would consider allowing HCT stockholders to elect to receive cash consideration with respect to up to 10% of the outstanding HCT shares.

115.   On May 23, 2014, HCT's Board held a special telephonic meeting to discuss the Unrelated Possible Acquisition and inform the HCT Board about the offer from Ventas.   At the conclusion of the May 23, 2014 special meeting, the HCT Board authorized Schorsch and HCT's management to continue to explore the possible business combination transaction with Ventas as well as the Unrelated Possible Acquisition.   HCT management was also authorized to enter into an exclusivity agreement with Ventas with respect to the possible acquisition of HCT.

116.   On May 24, 2014, HCT signed an exclusivity agreement with Ventas with respect to HCT potential acquisition by Ventas.   The exclusivity agreement provided for an exclusivity period through May 29, 2014.

117.   Also on May 24, 2014, HCT retained Venable LLP ("Venable") as special counsel to the HCT Board.

118.   Due diligence was conducted by Ventas and HCT between May 23, 2014 and June 1, 2014, and from May 26, 2014 through June 1, HCT and Ventas negotiated the terms of a potential merger agreement.

31

119.    During a special telephonic meeting on May 26, 2014, the HCT Board authorized HCT's management to continue more advanced negotiations with Ventas as well as with respect to the Unrelated Possible Acquisition.

120.    On May 27, 2014, during the course of discussions between HCT and the relevant third party concerning the Unrelated Possible Acquisition, HCT and the third party disagreed with respect to several key terms, including terms relating to financing, closing conditions and termination provisions of any such transaction.

121.    Following HCT's May 28, 2014 annual shareholders meeting the HCT Board held a meeting to discuss both the possible business combination transaction with Ventas and the Unrelated Possible Acquisition, at which HCT's Board determined that HCT's management should terminate discussions with respect to the Unrelated Possible Acquisition.

122.    During the HCT's May 28, 2014 Board meeting, the Board discussed the status of the due diligence review, the status of negotiations with Ventas and its advisors as well as the recent fluctuation in Ventas's stock price, which closed at $67.24 on May 27, 2014, and finalizing HCT's outstanding share OP Unit and LTIP Unit count (which could affect the aggregate per share consideration to be paid).   The HCT Board determined that HCT's management should continue negotiations with Ventas.

123.    During discussions between May 28, 2014 and May 31, 2014, management and representatives of HCT and Ventas participated in discussions and negotiations focused on, among other things, the structure of the partnership merger, the treatment of the Listing Note Agreement, the OPP, the Advisory Agreement and the Management Agreement at closing, the deal protection provisions with respect to the merger, the treatment of each party's regular dividend prior to closing.

124.    On May 29, 2104, the HCT met to discuss payments to the Advisor in connection with the Transaction, and Citi reviewed with the HCT Board its preliminary financial analyses relating to the proposed Transaction. At the conclusion of the meeting, the HCT Board authorized management to continue negotiations with Ventas.

125.    On June 1, 2014, representatives of Venable reviewed with the HCT Board its fiduciary duties under Maryland law when considering the Transaction.  Also at that meeting:

> The Advisor informed the HCT Board that, as part of the transaction, the Advisor and its affiliates (as applicable) would be willing to amend the Advisory Agreement, the Management Agreement and the OPP: (i) to terminate concurrently with the effective date of the merger without notice or further payment for any "tail amounts"; (ii) to waive certain other fees that would have been payable under the Advisory Agreement; (iii) to amend the Listing Note Agreement to fix the number of OP Units issuable in respect of the SLP interest thereunder; and (iv) to cancel all outstanding LTIP Units previously granted;

126.    Also on June 1, 2014, following this discussion, the independent members of the HCT Board convened in a private session with its legal representatives to further discuss aspects relating to the merger agreement including Ventas's requirement that amounts due under the Listing Note Agreement and the OPP be liquidated and the Advisory Agreement and Management Agreement be terminated concurrently with the merger and the Advisor's proposal related thereto.  The independent directors purportedly considered the amounts payable to the Advisor, the SLP and the affiliates under the OPP and each of the Advisory, Management and Listing Note Agreements.  After consideration of the Advisor's proposal and after extensive discussions, HCT's independent directors unanimously determined to approve the proposed amendments to the Listing Note Agreement, the OPP, the Advisory Agreement and the Management Agreement.

127.    The HCT Board then unanimously approved the Merger Agreement.

128.     In addition, included among the factors listed in the Preliminary Proxy as material factors that the HCT Board carefully considered in reaching its determination is "[t]he certainty of the value of the cash component of the merger consideration." However, if HCT's shares sore in value, as is occurring, the cash component of the consideration becomes worthless. Therefore, the Preliminary Proxy is materially false and misleading as to its assurance that the 10% cash component of the Merger consideration is a certainty.

129.     The Merger Agreement was executed by the parties on the night of June 1, 2014, and was publicly announced in a joint press release prior to opening of trading on the New York Stock Exchange and NASDAQ on June 2, 2014.

130.     The Preliminary Proxy misleadingly indicates that the Company took adequate steps to ensure that the negotiations leading to the Transaction were untainted by conflicts of interest, especially those of Schorsch and Kahane, or that the consideration price, which is based upon an Exchange Rate, which in turn is based upon a negotiated price for Ventas, was fair to the Company and its shareholders, including because the Merger Agreement does not include a collar on the price of Ventas's stock.

131.     As set forth in the Preliminary Proxy, the following fees and expense reimbursements are payable by HCT in connection with the merger: 0.25% of the transaction value of the merger, or approximately $4.75 million, payable to RCS Capital for provision of financial advisory and strategic services to HCT prior to the consummation of the merger pursuant to the HCT Investment Banking Services Agreement between HCT and RCS Capital, the investment banking and capital markets division of RCS; and 5,613,374 Units payable to the SLC.

34

132.    In addition, Schorsch would receive estimated compensation through the Transaction of $435,200 through the immediate vesting of all 40,000 restricted shares of HCT common stock held by Schorsch.

133.    The Individual Defendants failed to use reasonable care in approving the Transaction, including by failing to test the market to determine whether they could obtain a higher price for HCT's shares, or whether they could take other steps to increase HCT's share price, agreed not to undertake a market shop after executing the Merger Agreement and allowed RCS to advise the Company.    Consequently, the Individual Defendants, who have failed to properly inform themselves of the potential value of HCT, have not and cannot demonstrate that they have made an informed and knowledgeable decision in approving the Transaction.

*Preclusive Deal Protection Devices*

134.    Pursuant to the Merger Agreement, the Individual Defendants further agreed to certain onerous and preclusive deal protection devices that operate conjunctively to ensure that no competing offers will emerge for the Company, and also ensure that they will be unable to test the market to fully inform themselves as to the amount of consideration which another purchaser will be willing to pay—the best test of the value of a company.

135.    Pursuant to Section 6.5(a) of the Merger Agreement, the Individual Defendants have agreed, among other things, not to solicit offers or inquiries from third parties to acquire the Company, and not to engage in any discussions or negotiations regarding any such proposal, or furnish to any third party non-public information regarding the Company.

136.    As described in the Preliminary Proxy:

> The merger agreement contains "no shop" provisions that, subject to limited exceptions, restrict HCT's ability to solicit, encourage, facilitate, or discuss competing third-party proposal to acquire all, or a significant part, of HCT. In addition Ventas generally has an

opportunity to offer to modify the terms of the proposed merger in response to any competing acquisition proposals that may be made before the HCT Board may withdraw or qualify its recommendation or terminate the merger agreement to enter into an acquisition with respect to a superior proposal....

These provisions could discourage a potential competing acquirer that might have in interest in acquiring all, or a significant part, of HCT from considering or proposing that acquisition, even it were prepared to pay consideration with a high per share cash or market value than the market value proposed to be received or realized in the merger, or might result in a potential competing acquirer proposal to pay a lower price than it might otherwise have proposed to pay because of the added cost of the expense reimbursement or break-up fee that may become payable in certain circumstances.

137.    The Merger Agreement also provides that if the Company's Board receives what it believes to be a superior offer, it must then consult with a financial advisor and outside legal counsel to confirm if the offer is actually superior, and then provide Ventas with 3 business days to top the bid.  In summary, the Merger Agreement allows Ventas free reign to top a superior offer simply by matching it.  Accordingly, no rival bidder is likely to emerge to act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Ventas.

138.    The Merger Agreement also includes certain termination rights for both the Company and Ventas including a payment to Ventas of $55,000,000 if the Company accepts a superior proposal.

139.    In conjunction with Maryland's already stringent anti-takeover statutes, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company, or to enable the Individual Defendants to comply with their fiduciary duties in the event of a superior proposal in which they should exercise a "fiduciary out".

140.     These preclusive deal provisions are particularly burdensome given that the Merger Agreement prevents the Company from engaging in a market check.  Section 6.5(g) of the Merger Agreement provides:

> Upon execution of this Agreement, the Company shall, and shall cause each of the other Company Entities, and its and their officers and directors, managers or equivalent, and other Representatives to (i) immediately cease any existing discussions, negotiations or communications with any Person conducted heretofore with respect to any Transaction Proposal and (ii) take such action as is necessary to enforce any confidentiality or standstill provisions or provisions of similar effect to which any Company Entity is a party or of which any Company Entity is a beneficiary.  The Company shall use reasonable best efforts to cause all Third Parties who have been furnished confidential information regarding any Company Entity in connection with the solicitation of or discussion regarding an Transaction Proposal with the six (6) months prior to the date of this Agreement to promptly return or destroy such information (to the extent that they are entitled to have such information returned or destroyed).

141.     As a result, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company and its shareholders will suffer absent judicial intervention.

***The Transaction***

142.     Pursuant to the terms and subject to the conditions set forth in the Merger Agreement, each share of HCT common stock issued and outstanding immediately prior to the effective time of the Transaction will be converted into the right to receive, pursuant to an election made by each holder of the Company's common stock, (i) $11.33 in cash, or (ii) 0.1688 shares of common stock of Ventas.  However, pursuant to the Merger Agreement, in no event will the aggregate consideration paid in cash be paid on more than 10% of the shares of Company, and if the aggregate elections for payment in cash exceed such 10% threshold, then the amount of cash consideration paid on cash elections will be reduced on a *pro rata* basis with

37

the remaining consideration paid in Ventas common stock.  Non-electing stockholders of HCT will receive Ventas common stock based on the Exchange Ratio.

143.    HCT stockholders will not have a right to elect appraisal as an alternative remedy. Indeed, the Proxy provides, "HTC stockholders are not entitled to exercise the right of objecting stockholders to receive fair value of their shares because, as permitted by the Maryland General Corporation Law . . HCT's charter provides that stockholders shall not be entitled to exercise any appraisal rights unless the HCT Board, upon the affirmative vote of a majority of the board, shall determine that such rights apply", and, "[t]he HCT Board has made no such determination."

144.    In addition, the Company's interest as the General Partner of the OP will remain outstanding and constitute the only outstanding general partnership interest of the resulting Company; and each unit of limited partnership interests in the OP or the "OP Units issued and outstanding immediately prior to the effective time of the Partnership Merger, including the 5,613,374 OP Units to be issued in respect of the termination of the Listing Note Agreement to the SLP, will be converted into such number of Class C Units, thereby diluting the Company's holdings in the OP.  Class C Units are profit interests in the Operating Partnership.

145.    Both the Advisory and Property Management Agreements, among other things, will be cancelled.

### Schorsch and Kahane Locked-In Greater Profit

146.    As a consequence of the Acquisition, and the fact that their Special Limited Partner distribution will be based upon a price of $11.33 per share, Schorsch and Kahane have locked in significantly greater profit than if the Company had taken other steps or remained independent.

147.    Under the Listing Note Agreement, upon the listing of the Company, the SLP, and thus Schorsch and Kahane, could redeem the SLP interest for a distribution equal to: 15% of the

38

difference between the market value of all HCT shares, plus all distributions paid to shareholders, less the sum of total gross proceeds of offerings, plus 6% return, less distributions received by the SLP (an amount which is not publicly available).

148.    Using $11.33 as the market value, which Schorsch and Kahane ensured through the Transaction, they are receiving over 5.6 million operating units (through which they will receive profits of the Operating Partnership).

149.    However, taking the average trading price of HCT for the 30-day period after it commenced listing, unaffected by the announcement of the Acquisition, the consideration which would have been distributed to the SLP would have been based upon a price of $9.33 per share which would have given Schorsch and Kahane distributions of about $40 million less than they are going to receive as a consequence of the Transaction.

150.    By hastily entering into the Transaction, Schorsch and Kahane secured greater consideration and far greater number of operating partnership shares, and thus interest in the operating partnerships' profit distribution.

151.    Notably, under the Listing Note Agreement, one of the key inputs for determining the SLP distribution is the amount of distributions already received by the SLP.  This information, however, is not publicly available making it impossible for any shareholder to determine the amount of profit that Schorsch and Kahane are receiving or how much more than are going to receive as a consequence of the Transaction versus other alternatives or remaining independent.

152.    As discussed below, the increased consideration pursuant to the SLP is not disclosed in the Preliminary Proxy.  The Preliminary Proxy does not contain an analysis of the difference in the SLP distribution Schorsch and Kahane would indirectly receive as a result of

#2310008v.1

the Transaction.  Nor does the Proxy disclose how the SLP distribution of 5.6 million OP shares was calculated or the anticipated value of those shares.

153.    Inclusion of such analysis in the Proxy Statement is necessary for HCT shareholders to be fully informed of Schorsch's and Kahane's conflicts of interest.

***The Materially False and Misleading Proxy Statement***

154.    HCT is presently attempting to solicit shareholder approval of the Transaction by means of a materially false and misleading Preliminary Proxy, including a false and misleading Fairness Opinion as indicated above.

155.    The Proxy is also false and misleading because it falsely represents that the Merger Consideration provides a significant premium, *e.g.,* 14%, to HCT shareholders, when it does not, and because the increased consideration pursuant to the SLP is not disclosed in the Preliminary Proxy, among other things.

156.    While HCT's stock traded below $11.00 per share at the time the Transaction was announced, the stock is currently trading at over $11.44 per share.  Thus, the Proxy's representation that the Merger consideration represents a significant premium above market value is false.

157.    The Preliminary Proxy is further misleading in that includes a general discussion of the agreement between RCS and HCT, but does not contain at least a range of the fees RCS may earn if the Transaction proceeds and if the Transaction is terminated.  Moreover, the discussion in the Preliminary Proxy (at page 69) uses undefined terms concerning the "Transaction Value" on which RCS's fee is based, including terms such as "promote paid," rendering it impossible for HCT shareholders to determine the actual amount of fees RCS will be paid on the Transaction and thus the consideration to be earned at least indirectly by Schorsch.

40

These inadequate disclosures are directly relevant to the conflicts of interest of the Directors and officers of HCT.

***Citi's Fairness Opinion***

158.   HCT retained Citigroup as its financial advisor in connection with the proposed Transaction, to evaluate the fairness from a financial point of view, of the consideration to be received by HCT shareholders pursuant to the Transaction.   The description of the Fairness Opinion contained in the Proxy, however, is materially false and misleading.

159.   Citi's June 1, 2014 opinion letter states, "[w]e are not expressing any view or opinion as to the actual value of Ventas Common stock when issued in the Merger or the prices at which Ventas Common Stock (or any other securities of Ventas) or ARCHT Common Stock (or any other securities of ARCHT) will trade or otherwise be transferable at any time."   Thus, Citi's opinion cannot inform a determination of the yet-unknown actual Merger Consideration.

160.   The Proxy Statement represents at page 58 that Citi "considered, to the extent publicly available, the financial terms of other transactions which Citi considered relevant in evaluating the merger," but does not identify those "other transactions."

161.   Further, the Proxy Statement does not disclose whether Citi considered the distribution to be received by the SLP and the fact that the gross amount of the merger consideration would have been greater if a large distribution were not being made to the SLP.

162.   The Proxy Statement indicates at page 59 that "Citi's opinion [did not consider] any other agreement, arrangement or understanding to be entered into in connection with or contemplated by the merger or related transactions or otherwise."   If Citi did consider the distribution to the SLP and the fact that the distribution decreased the total consideration provided to HCT shareholders, as suggested in a June 2, 2014 investor presentation, this should be expressly disclosed in the Proxy Statement.   If Citi did not consider the distribution to the

41

SLP, this omission to consider should also be expressly disclosed because it directly and significantly impacts the consideration provided to HCT shareholders and directly impacts whether the Fairness Opinion is adequate or misleading.

Selected Public Companies Analysis

163.    The Proxy first misleadingly discusses Citi's Selected Public Companies Analysis.    Proxy Statement at pages 61- 62.   In the Selected Public Companies Analysis, Citi derived a number of multiples based on the selected companies' EBITDA, FFO, AFFO and implied cap rates, and  then applied those multiples to HCT's projected pro formas, including and excluding unidentified acquisitions.   Although Citi disclosed the high and low range of multiples and the mean or average multiple, Citi failed to disclose the actual multiples applied to each selected public company and the median multiple, which is often a truer determinant of the multiple that should be applied to calculate a company's value, or the results of an analysis based on the median multiple.

164.    Moreover, Citi's Selected Public Companies Analysis is based  on  certain projections for HCT "excluding unidentified acquisitions" and "including unidentified acquisitions." It employs pro forma figures as of June 30, 2014 based on HCT completing $250 million in unidentified acquisitions (for the next 12 months).   But HCT's Form 10-Q for the period ended September 30, 2014 indicates at page 11 that for the nine months ended September 30, 2014, the Company acquired 38 properties and expended over $500 million in real estate acquisitions, which would result in a far greater valuation for the Company than a pro forma based on $250 million in acquisitions.   This reveals that the pro formas on which Citi's valuations are based do not accurately reflect the true value of the Company and therefore that its analysis is misleading and results in too low a valuation for HCT.

Selected Precedent Transactions Analysis

165.    The Proxy further contains a discussion of Citi's Selected Precedent Transaction. Citi's Selected Precedent Transactions analysis fails to disclose the median cap rate for selected company transactions, though it discloses the mean cap rate, and does not disclose the implied cap rate for any of the selected transactions which would enable HCT shareholders to determine the mean and any cyclical changes in the implied cap rate.

166.    Citi's Selected Precedent Transactions analysis also applies a low and high range of cap rates to the estimated next 12 months net operating income of HCT as of March 13, 2014, rather than June 30, 2014 as was done in the Selected Public Companies analysis (both of which are outdated given that the Transaction is not likely to close this year and the availability of September 2014 data). These ranges were also applied to HCT's net operating income assuming that HCT made $250 million in acquisitions. There is no indication why the implied cap rate was not determined assuming a pro forma based on unidentified acquisitions of $500 million, as Citi did with the Discounted Cash Flow Analysis, discussed below, which would be consistent with that analysis and result in a higher value for HCT. Citi's failure to make such disclosures is misleading.

Discounted Cash Flow Analysis

167.    Citi's discounted cash flow analysis fails to disclose the Company's Free Cash Flow despite the fact that there is a cash element to the merger consideration; nor is this information disclosed in any other part of the Proxy.

168.    Citi's discounted cash flow analysis is based on the Company's unlevered free cash flows. Although a portion of the consideration being offered in the Transaction is cash, the unlevered free cash flows on which Citi relied are not disclosed and should be disclosed. Citi

43

then applied the implied terminal cap rate to projections or forecasts which were then discounted to present value as of March 31, 2014, a period inconsistent with Citi's other valuations which are as of June 30, 2014.

169.    Moreover, Citi's discounted cash flow analysis is based on pro forma financials for HCT including unidentified acquisitions of $250 million.  Again, according to the most recent Form 10-Q, the Company has already made over $250 million in acquisitions, rendering this analysis inaccurate and misleading.

The Consideration to be Received by Schorsch and Kahane

170.    Critically, the Proxy Statement also fails to disclose the increased distribution or consideration to Schorsch and Kahane through the SLP.  Although the Preliminary Proxy does state generally that the directors and executive officers of HCT have arrangements that provide them with interests in the merger that are different from or in addition to those of HCT shareholders, it does not indicate that by way of the Merger Agreement, the SLP redemption or distribution amount, and thus the amount that Kahane and Schorsch will be receiving, is greater than the distribution which likely would have been made under the Listing Agreement had HCT not entered into the Merger Agreement and thus going forward, Schorsch and Kahane, at least indirectly, will receive a greater profit participation in the Company than they would have had the Company not entered into the Merger Agreement.

171.    The Proxy Statement fails to disclose the calculation of the 5,613,374 OP units to be distributed to the SLP and the value of these units.  The calculation and the value, and discussions concerning this distribution, must be disclosed.

172.    Using the unaffected average price for the 30 days after listing and before the Transaction was announced, the immediate increase in consideration is at least $40 million.

Projections on page 66 of the Proxy Statement

173.    In the projections on page 66 of the Proxy Statement, the FFO and AFFO amounts are given on a cumulative basis rather than on a per share basis.  Since shareholders are being asked to give up shares for cash, the Proxy Statement must disclose the FFO and AFFO figures on a per share basis so that shareholders can make an informed decision whether to forego the cash component.

174.    The projects on page 66 of the Proxy Statement indicate that they are based on a base case and a base plus case.  The base case presumably represents HCT on a standalone basis with known acquisitions in the first half of fiscal year 2014.  This base case should be revised to reflect all acquisitions HCT has made through at least the third quarter of 2014, as reflected in the Company's Third Quarter 10-Q.  Moreover, it is unclear whether the base case projections also include $250 million or $500 million in unidentified acquisitions which were used in Citi's Selected Public Companies analysis, and thus it is unclear if the projections used in this analysis are consistent with the estimates used in Citi's Discounted Cash Flow analysis.

175.    For the foregoing reasons, the Proxy is materially false and misleading.

176.    The aforesaid nondisclosures, inconsistencies, inadequacies and inaccuracies in Citi's fairness opinion provide a basis for this Court to order that the Transaction be enjoined or rescinded, among other relief.

Plaintiff Has Already Created a Benefit

177.    Plaintiff has already created a benefit.  The Preliminary Proxy contains several disclosures complaint about in the Verified Amended Class Action and Derivative Complaint, including the discussion concerning how Ventas's implied price was determined and elsewhere.

## COUNT I

### (Class Claim Against the Individual Defendants, HCT and Ventas for Violations of Exchange Act Section 14(a) and Rule 14a-9 Promulgated Thereunder)

178.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

179.     Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. §78l]."

180.     SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy or the same meeting or subject matter which has become false or misleading." 17 C.F.R. §240.14a-9(a).

181.     By way of the Preliminary Proxy, the defendants disseminated the false and misleading Preliminary Proxy which failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants solicited Plaintiff and the Class to vote on the Transaction via the Preliminary Proxy.

A shareholder vote is required to approve the Transaction. Thus, the Preliminary Proxy is an essential causal link in the adoption and accomplishment of the Transaction.

182. As a result of defendants' preparation, review and dissemination of the Preliminary Proxy containing material misrepresentation(s) and/or omission(s) Plaintiff and the other members of the Class have suffered substantial harm.

183. The misrepresented or omitted facts are material because under all circumstances there is a substantial likelihood that a reasonable shareholder would consider these false and misleading statements or omitted facts important in deciding how to vote on the Transaction and would consider these facts to be a material part of the mix of information available to Plaintiff and the Class in deciding how to vote on the Transaction. Thus, Plaintiff and the other HCT shareholders of record were denied the right to make an informed decision respecting the Transaction.

184. None of the materially false and misleading statements contained in the Preliminary Proxy were known to Plaintiff or other members of the Class at the time they would be required to cast their votes respecting the Transaction.

185. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their exchange of stock pursuant to the terms of the Transaction.

186. By reason of such misconduct, defendants are liable pursuant to §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. Defendants have also failed to correct the Preliminary Proxy and the failure to update and correct false statements is also a violation of §14(a) and Rule 14a-9.

187.     The written communications made by the defendants described herein constitute violations of §14(a) and Rule 14a-9 because such communications are materially misleading, were provided in a negligent manner, will have a direct and clear impact on the voting process and will impact the outcome of the vote itself.

188.     Defendants' violations of §14(a) and Rule 14a-9 entitle Plaintiff to injunctive relief because Plaintiff will suffer irreparable injury unless the injunction issues, in that the shareholder voting procedures have been impermissibly infected, the threatened injury to the moving party outweighs any damage to the opposing party, the injunction, if issued, will not be adverse to the public interest and a substantial likelihood exists that Plaintiff will prevail on the merits.

## COUNT II

### (Derivative Claim for Breach of Fiduciary Duty Against the Individual Defendants)

189.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

190.     As members of the Company's Board, the Individual Defendants have fiduciary obligations to: (a) undertake an appropriate evaluation of HCT's value as a merger/Transaction candidate; (b) take all appropriate steps to enhance HCT's value and attractiveness as a merger/Transaction candidate; (c) act independently to protect the interests of the Company; (d) adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such conflicts exist, to ensure that all conflicts are resolved in the best interests of HCT; (e) actively evaluate the Transaction; (f) take all steps necessary to make a fully informed decision and (g) to act in the best interests of the Company.

191.     The Individual Defendants have breached their fiduciary duties to the Company by (1) approving an entirely unfair transaction, which was the product of a process tainted by self-interest, at an inadequate price; and/or (2) failing to exercise reasonable care to fully inform

48

themselves of the Company's true value and the value of Ventas before entering into the Transaction.

192.   As alleged herein, the Individual Defendants have initiated a process to sell HCT that undervalues the Company and vests certain of them with benefits that are not shared equally by HCT and constitutes a waste of HCT's assets.  In addition, by agreeing to the Transaction, the Individual Defendants have capped the price of HCT at a price which does not adequately reflect the Company's true value.   The Individual Defendants also failed to sufficiently inform themselves of HCT's value, or disregarded the true value of the Company in an effort to benefit themselves.  Furthermore, any alternate acquirer will be faced with engaging in discussions with a management team and Board that is committed to the Transaction.

193.   As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to the Company.

194.   The Company has no adequate remedy at law.

## COUNT III

**(Derivative Claims for Aiding and Abetting the Board's Breaches of Fiduciary Duty Against the SLP, the Operating Partnership, the Sponsor and Ventas)**

195.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

196.   Defendants the SLP, the Operating Partnership, the Sponsor, and Ventas knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Transaction and provided substantial assistance without which such breaches would not have occurred.

197.   As a result of this conduct, the Company has been and will be damaged in that it has been and will be prevented from obtaining a fair consideration.

198.   The Company has no adequate remedy at law.

#2310008v.1

## COUNT IV

### (Derivative Claim for Breach of Contract Against the Individual Defendants)

199.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

200.    As members of the Board of the General Partner and the Company's Board, the Individual Defendants had contractual duties pursuant to Section 6.04 of the Partnership Agreement to place the interests of the Company ahead of those of the limited partners of the Operating Partnership, in the event of a conflict of interest situation in which the conflict could not be resolved to the benefit of all entities.

201.    The Individual Defendants, while acting as both the directors of the General Partner and the Company, when faced with the choice of approving a conflicted transaction, were, as directors of the General Partner, to cause the General Partner to place the interests of HCT's shareholders above those of other limited partners.

202.    In approving the unfair and inadequate Transaction, they instead placed the interest of the SLP (and Schorsch, Kahane and the Sponsor) ahead of those of HCT and its shareholders.

203.    The Individual Defendants have thus caused the nominal defendant as the General Partner to breach the Partnership Agreement, and subjected it to potential liability.

204.    As such, they have breached the Partnership Agreement.

205.    Unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to the Company.

206.    The Company has no adequate remedy at law.

## COUNT V

### (Class Claims for Breach of Fiduciary Duties Against the Advisor)

#2310008v.1

207.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

208.    Pursuant to the Advisory Agreement, as amended, the Advisor owes direct fiduciary duties to HCT's shareholders.

209.    The Advisor, which had the obligation to serve as the Company's investment and financial advisor and to supervise others, approved and allowed the Individual Defendants and the Company to approve the unfair and tainted Transaction.

210.    The Advisor has breached its fiduciary duties to Class members.

211.    As such, unless the Advisor's conduct is enjoined by the Court, it will continue to breach its fiduciary duties to the Company.

## COUNT VI

**(Class Claims for Aiding and Abetting Breach of the Fiduciary Duty of the Advisor Against The Sponsor, the SLP, the Operating Partnership, Schorsch, Kahane and Burns)**

212.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

213.    Defendants the SLP, the Operating Partnership, the Sponsor, Schorsch, Kahane and Burns knowingly assisted the Advisor's breaches of fiduciary duty in connection with the Transaction and provided substantial assistance. Without such aid, the breaches would not have occurred.

214.    As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged.

**WHEREFORE,** Plaintiff prays for judgment and relief as follows:

(a)    Ordering that Counts I, V - VI be maintained as a class action and certifying Plaintiff as the Class Representative;

51

(b)     Ordering that Counts II - IV be maintained derivatively by Plaintiff on behalf of the Company;

(c)     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Transaction, or, alternatively, enjoining Defendants from conducting a vote on the Transaction until shareholders are provided with a proxy statement that is not false and misleading;

(d)     In the event Defendants consummate the Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff, HCT and/or the Class;

(e)     Directing Defendants to account to Plaintiff, HCT and/or the Class for their damages sustained because of the wrongs complained of herein;

(f)     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

(g)     Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: December __, 2014

**TYDINGS & ROSENBERG LLP**

_/s/ Daniel S. Katz_____
John B.  Isbister, Federal Bar No. 00639
Daniel S. Katz, Federal Bar No. 01148
100 East Pratt St., 26th Floor
Baltimore, Maryland 21202
Tel:  (410) 752-9700
Fax:  (410) 727-5460

Attorneys for Plaintiff

52

OF COUNSEL FOR PLAINTIFF

**THE GRANT LAWFIRM, PLLC**
Lynda J. Grant
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: (212) 292-4441
Fax: (212) 292-4442

**STULL, STULL & BRODY**
Howard Longman
Jason D'Agnenica
6 East 45th Street
New York, NY 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

#2310008v.1